UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CZ SERVICES, INC., et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>EXPRESS SCRIPTS HOLDING COMPANY, et al.,<br><br>          Defendants. | Case No. 3:18-cv-04217-JD<br><br>**ORDER RE EXPERT WITNESS MOTIONS, MOTION TO STRIKE, AND DISCOVERY**<br><br>Re: Dkt. Nos. 241, 243, 246, 247, 303, 332 |

This order resolves the parties' motions to exclude expert witnesses, Dkt. Nos. 241, 243, 246, 247, and ESI's related motion to strike, Dkt. No. 303. It also addresses a letter from ESI about developments in the ownership of CZ Pharmacies. Dkt. No. 332. Detailed statements about the parties, claims, and salient facts are presented in the Court's orders on the TRO application, transfer of venue, and summary judgment. *See* Dkt. Nos. 57, 92, 333. In keeping with the prior orders, this order refers to plaintiffs as "CZ Pharmacies." Together with Care Zone Inc. ("CareZone") and Jonathan Schwartz, they are counterclaim-defendants in this case. Defendants are "ESI." The parties' familiarity with the record is assumed.

**I.     LEGAL STANDARDS**

Federal Rule of Evidence 702 governs the admissibility of expert witnesses. The touchstones for admissibility under Rule 702 are the relevance and reliability of the expert witness's opinions. The Court performs a "gatekeeping role" to ensure that expert witness opinions are valid and reliable, and will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590-91, 597 (1993) (quoting Rule 702). Relevance is sometimes given less attention as a gatekeeping factor, but it is as much a precondition of admissibility as reliability. An expert's methods and analysis

1  may be flawless, but "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id*. at 591 (internal citation omitted). The testimony must "fit" the case, and be tied to the claims and facts in a way that helps the jury decide the dispute between the parties. *Id*.

The reliability factor looks at "whether the reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-93. This is a flexible inquiry. *See Brickman v. Fitbit, Inc.*, Case No. 3:15-cv-02077-JD, 2017 WL 6209307, at *3 (N.D. Cal. Dec. 8, 2017) (citing *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017)). Relevant factors include: "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Id*. (quoting *Murray*, 870 F.3d at 922). These factors "are not a definitive checklist or test" and "the reliability analysis remains a malleable one tied to the facts of each case." *Id*. (quoting *Murray*, 870 F.3d at 922). The goal is to ensure "that the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019) (internal quotation and citation omitted).

As the Court has often emphasized, Rule 702 is not directed to "the correctness of the expert's conclusions but the soundness of his methodology." *Brickman*, 2017 WL 6209307, at *4 (quoting *Daubert v. Merrell Dow Pharm., Inc.* (*Daubert II*), 43 F.3d 1311, 1318 (9th Cir. 1995)). If the method is valid and accepted in the field, and fits the case, it will be admitted; attacks on the quality of the data the expert used, the application of the methodology to the data, and the overall persuasiveness of the expert's opinions are matters for cross-examination. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237-38 (9th Cir. 2017) (citing *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc) and *Daubert*, 509 U.S. at 596). The "district judge is a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (internal quotation and citation omitted).

1    An expert's opinion "is not objectionable just because it embraces an ultimate issue" in a
2    case. Fed. R. Evid. 704(a). But legal opinions are not the proper subject of expert testimony.
3    *Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017). An expert may not give opinions that are
4    legal conclusions, *United States v. Tamman*, 782 F.3d 543, 552-53 (9th Cir. 2015), or attempt to
5    advise the jury on the law, *Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046-47 (9th Cir. 2013).
6    The Court has broad discretion and latitude to determine admissibility under Rule 702.
7    *Estate of Barabin*, 740 F.3d at 463. No particular procedure is required. *Id*.

## II.   CZ PHARMACIES' MOTIONS

### A.   Dr. Alyson Wooten (Dkt. No. 241)

ESI has proffered Dr. Alyson Wooten as an expert witness. Dr. Wooten states that she is the Associate Director of Berkeley Research Group's Health Analytics Practice. Dkt. No. 240-6 at 1. She holds a pharmacy doctorate and a J.D., has served as a pharmacist in multiple settings, including retail, and has provided legal and regulatory advice to pharmacy clients as a lawyer and a consultant. *Id.* at 1-2. ESI seeks to call Dr. Wooten at trial to opine on her conclusions that: (1) the CZ Pharmacies do not function as retail pharmacies; (2) the CZ Pharmacies are "not conducive to quality retail pharmacy care;" (3) the designation of CareZone and CZ Pharmacies as an "agent" of a customer is not consistent with how agency is used in retail pharmacy practice; (4) the standard in the industry is to obtain licenses in every state in which a pharmacy's patients reside; (5) the CZ Pharmacies made misrepresentations in applications for several state licenses; and (6) the CZ Pharmacies regularly shipped prescriptions into states where they were not yet licensed. *See id.* at 3.

These opinions are largely inadmissible as expert testimony. For the most part, they are little more than reports of what Dr. Wooten personally saw in visits to various CZ Pharmacies locations, or in documents she reviewed about CZ Pharmacies' operations. They are much more akin to percipient witness observations than to opinions arrived at through a scientific inquiry or expert analysis. Dr. Wooten's report is striking for the complete absence of any methodological discussion at all. Her "method" consisted mainly of walking into CZ Pharmacies' properties and taking pictures and notes. That is hardly a matter of specialized analysis or inquiry.

3

Nor are these opinions directed to a subject matter beyond the ken of ordinary jurors. It is fair to say that just about any citizen who may serve on the jury in this case is familiar with what retail pharmacy businesses look like and how they function. The Court previously advised the parties that expert testimony on this and related issues would be of doubtful admissibility. *See* Dkt. No. 213 at 53:15-57:9; Dkt. No. 237 at 41:16-44:20. Dr. Wooten's report and proposed testimony have changed that doubt into a certainty against admissibility.

Dr. Wooten may present at trial her opinions about pharmacy licensing standards and practices. This is a specialized area where expert testimony might be helpful to the jury on the issue of whether CZ Pharmacies was licensed to do business in the locations and at the times relevant to ESI's defenses. *See United States v. Laurienti*, 611 F.3d 530, 547-49 (9th Cir. 2010) (expert witness may testify to industry rules and defendants' practices). CZ Pharmacies objects that Dr. Wooten is not qualified by training or experience for this testimony, but she holds a Doctor of Pharmacy degree and worked for several years as a pharmacist and consultant on pharmacy-related issues. That is sufficient for her to testify. CZ Pharmacies may "evaluate critically her further qualifications upon cross-examination or in argument." *United States v. Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993). So too for the "inaccurate statements" that CZ Pharmacies finds in Dr. Wooten's proposed opinions. *See Primiano*, 598 F.3d at 565-67.

Dr. Wooten may also present her analysis comparing CZ Pharmacies' licenses to the dates on which it dispensed drugs to patients. This analysis involved approximately one million transactions, and is well within the zone of opinions that may assist the jury in weighing ESI's defenses.

Within this limited set of opinions, Dr. Wooten may not say at any point that CZ Pharmacies' practices were illegal or unlawful. The request to strike Dr. Wooten's supplemental report is denied. Parties are required to supplement expert disclosures as necessary under Rule 26(a)(2)(E) until at least 30 days before trial "if the party learns that in some material respect the disclosure or response is incomplete or incorrect." *See* Fed. R. Civ. P. 26(a)(3), 26(e)(2). Dr. Wooten's corrective report was filed on November 4, 2019, more than four months before the then-scheduled March 9, 2020 trial date.

4

### B. Mr. David A. Kvancz (Dkt. No. 243)

ESI has also proffered Mr. Kvancz as an expert witness. Mr. Kvancz is a healthcare consultant who has served in senior pharmacy leadership roles at Kaiser Permanente and the Cleveland Clinic. Dkt. No. 242-6 at 1-3. ESI seeks to call him at trial to testify as to his opinions that: (1) retail and mail order pharmacy operations are not interchangeable; (2) the CZ Pharmacies do not operate as retail providers; (3) the CZ Pharmacies operate as mail order pharmacies; (4) CZ California made misrepresentations in its provider certifications to ESI relating to its mail order operations; (5) CZ Tennessee made similarly false representations on its provider certification form; (6) CZ Pharmacies' practice of sending 99% of ESI member prescriptions outside the state and/or 15 mile local area is inconsistent with retail operations; (7) CZ Pharmacies' claims data for other PBMs demonstrates its mail order operations; (8) use of a third-party, Parliament, in CZ Pharmacies' delivery operations is consistent with mail order practice; and (9) use of Parliament in CZ Pharmacies' operations creates quality and safety concerns. *See id.* at 4-5.

Mr. Kvancz's proposed testimony overlaps considerably with Dr. Wooten's, and his opinions will be limited in exactly the same way. The Court's main concern with Mr. Kvancz is that his testimony will be unduly duplicative and redundant of Dr. Wooten's testimony, a concern the Court expressed at the hearing. Dkt. No. 328 at 84:17-23. For example, the record indicates that he and Dr. Wooten performed very similar investigations about the location of CZ Pharmacies' customers, and reached similar conclusions such as "the vast majority of [CZ Tennessee's] prescriptions at this time (approximately 95%) were being mailed out of state." Dkt. No. 240-6 at 30 (Dr. Wooten); Dkt. No. 242-6 at 57 (same for Mr. Kvancz). The parties are advised that duplicative expert testimony will not be permitted at trial.

### III. ESI'S MOTIONS

#### A. Dr. Doug Hillblom And Mr. Richard B. Mazzoni (Dkt. No. 247)

CZ Pharmacies has proffered Dr. Hillblom and Mr. Mazzoni as expert witnesses. Dr. Hillblom is a pharmacist and health care consultant who has worked on pharmacy-related issues for a PBM/insurer, a hospital group, and the state of California, among others. Dkt. No. 248-4 at 2-3. CZ Pharmacies seeks to offer his opinions on the business practices and partnership

5

between CZ Pharmacies and CareZone, which provides an online app for pharmacy customers. *Id.* at 4. He will opine that: (1) CZ Pharmacies' business partnership with CareZone is an innovative business model; (2) CZ Pharmacies' operations are consistent with industry understandings of retail pharmacies; (3) the operations of CZ Pharmacies are consistent with contractual obligations to ESI and other PBMs under relevant industry understandings; and (4) the business model allows app users to better manage their prescriptions. *See id.* at 5-6.

Mr. Mazzoni is also a pharmacist and healthcare consultant. Dkt. No. 248-6 at 1-2. He has served on multiple state boards of pharmacy and in senior positions at CVS Caremark, a large pharmacy chain and PBM, as well as another pharmacy, with a focus on regulatory compliance. *Id.* CZ Pharmacies offers Mr. Mazzoni to opine that: (1) CZ Pharmacies operate as a retail pharmacy, and not a mail order business; (2) ESI and its experts are trying to influence or replace state boards of pharmacy as the sole entity responsible for ensuring patient safety and compliance with state law; (3) ESI's experts incorrectly assert that CZ Pharmacies operates unsafely or out of compliance with industry standards; (4) the physical appearance of a pharmacy is not indicative of its practice type; (5) reporting changes in the pharmacist-in-charge (PIC) position to a state board of pharmacy can be delayed and has little impact on patient safety; (6) CZ Pharmacies timely reported PIC changes to the appropriate regulator; (7) CZ Pharmacies maintained appropriate licensure; and (8) CZ Pharmacies did not make misrepresentations on licensing applications. *Id.* at 4.

Consistent with the determinations for Dr. Wooten and Mr. Kvancz, Dr. Hillblom and Mr. Mazzoni may testify about pharmacy industry and regulatory practices, licensing requirements, and whether CZ Pharmacies provided appropriate patient care. Neither Dr. Hillblom nor Mr. Mazzoni may testify about their interpretation of any terms in CZ Pharmacies' contracts with ESI, including "mail order" and "retail," or whether any contractual provisions were satisfied or breached. Dkt. No. 328 at 88:2-90:8. Construing the words in a contract is a question of law for the Court, *see Webbe v. Keel*, 369 S.W.3d 755 (Mo. App. 2012), and testimony about contract compliance would necessarily implicate a legal conclusion.

Dr. Hillblom's opinions about agency law, CZ Pharmacies' corporate structure, and competition in the provision of pharmacy services are also excluded. *See* Dkt. No. 248-4 at 30-33. The agency law topic is obviously impermissible legal opinion, and Dr. Hillblom's background as a pharmacy executive does not qualify him to give testimony on issues of corporate structure and competition. Those topics are also well suited to testimony by CZ Pharmacies' employees, who are likely to know them as part of their jobs.

### B.     Ms. Lisa C. Snow (Dkt. No. 246)

CZ Pharmacies has proffered Ms. Snow as a damages expert to opine on how the valuation of CZ Pharmacies as an ongoing business changed after ESI terminated its network provider contracts. Dkt. No. 245-5 ¶ 7. In her initial report, Ms. Snow used methods she called an "Income Approach" and a "Market Approach" to conclude that the termination reduced CZ Pharmacies' valuation by $439 million to $538 million. *Id*. ¶ 10. In her supplemental report, these figures were revised slightly downward to a range of $436 million to $535 million. Dkt. No. 265-7 ¶ 72. She also purported to calculate the pharmacies' lost profits. Dkt. No. 245-5 ¶ 11. Ms. Snow is a managing director at a firm that provides damages and valuation consulting for litigation. *Id*. ¶ 1. She holds, among other degrees, an MBA from the University of Chicago Booth School of Business, and has testified on a number of occasions as a damages and valuation expert. *Id*. ¶¶ 2-6.

The parties' dispute over the admissibility of Ms. Snow's opinions focuses on the validity and reliability of her valuation methodology, but there are also questions about the fit of her opinions to the facts and issues in this case, and whether her testimony would be relevant and helpful. Based on the record as it currently stands, the Court is inclined to exclude Ms. Snow and her proposed testimony *in toto* over serious concerns about relevance and reliability. Before doing that, the Court will hold an additional hearing on these admissibility issues, which the Court noted at oral argument was a possibility. Dkt. No. 328 at 78:6-12.

On the threshold question of relevance and fit, it is not at all clear how Ms. Snow's valuation opinions are tied to any of CZ Pharmacies' claims or damages theories in this case. She was asked "to offer an opinion as to the value of CareZone Pharmacy as of June 30, 2018 (the

7

'Valuation Date') but for the actions of Express Scripts as of April 12, 2017 (the 'Cease and Desist Date') and July 13, 2018 (the 'Network Dismissal Date') by way of the April 2, 2018 termination letter to CZ Services, Inc. and the April 18, 2018 letter to CareZone Pharmacy." Dkt. No. 245-5 ¶ 7. Her opinions are expressly based on ESI's cease-and-desist and termination letters as the cause of the change in valuation. Dkt. No. 265-7 ¶ 3. She calculated "CareZone Pharmacy's growth through the Valuation Date, but for the termination following Express Scripts Cease and Desist letter." Dkt. No. 245-5 ¶¶ 54, 110, 111; *see also* Dkt. No. 265-7 ¶ 50 ("Lost Profits analysis contains a projection of the 'actual' world, where CareZone is dismissed from Express Scripts' network, and a 'but-for' world, where CareZone did not receive a cease and desist letter and was not terminated from Express Scripts' network").

The problem is that this before-and-after valuation of CZ Pharmacies as an ongoing enterprise is not tethered to a specific claim for damages in this case. CZ Pharmacies did not sue ESI for breach of contract, and so Ms. Snow's valuation analysis is not germane to contract damages. CZ Pharmacies has not made a specific damages claim in connection with the Tennessee AWP statute, Tenn. Code Ann. § 56-7-2359, and nothing in the statute appears to indicate that damages would be available even if CZ Pharmacies were to prevail on the limited portion of the claim that survived summary judgment. *See* Dkt. No. 333 at 9-13.

For the defamation claims, which are a significant part of CZ Pharmacies' case against ESI, Ms. Snow made no effort to tie her valuation analysis to defamation injury. Her initial and supplemental reports make a passing reference to ESI's defamatory statements that "harmed CZ Services because CZ Services operates in a highly regulated pharmaceutical industry," but the connection between her model and this alleged harm is never discussed in a meaningful way. *See* Dkt. No. 245-5 ¶ 17; *see also* Dkt. No. 265-7 ¶ 4. To the contrary, she focuses on how termination, and the threat of it, affected CZ Pharmacies. *See, e.g.*, Dkt. No. 245-5 ¶ 44; *see also* Dkt. No. 265-7 ¶ 5 (same in supplemental report). In addition, she did not attribute any portion of the valuation or lost profits damages to specific defamatory statements, as she should have done. *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 729 (9th Cir. 1999).

The same lack of relevance is true for CZ Pharmacies' unfair competition claims. Under California law, for example, no damages are available for unfair competition, and monetary relief is limited to restitution of money lost by the plaintiff and obtained by the defendant. *See Sharpe v. Puritan's Pride, Inc.*, ___ F.Supp.3d ___, 2020 WL 3128900, at *2-*3 (N.D. Cal. 2020). It is highly doubtful that a change in enterprise valuation could be deemed a restitutionary measure or remedy. Ms. Snow certainly did not discuss or present it as such.

So too for CZ Pharmacies' claim for intentional interference with prospective economic relations. As Ms. Snow's report indicates, her valuations are directly related to the assumption that CZ Pharmacies lost possible venture-capital and other investments. *See, e.g.*, Dkt. No. 245-5 ¶ 40. That is too speculative a loss. *See Youst v. Longo*, 43 Cal.3d 64, 74 (1987). The mere "hope for an economic relationship and a desire for future benefit" do not allow for intentional interference damages. *Blank v. Kirwan*, 39 Cal.3d 311, 331 (1985).

To be sure, relevance for Rule 702 purposes is not a particularly high bar. It demands "only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert II*, 43 F.3d at 1315). But even generously construed, Ms. Snow's proposed opinions lack any obvious relationship to the damages that might be available to CZ Pharmacies.

Another factor calls the relevance of her opinions into further doubt. A fundamental assumption of her analysis -- that CareZone (the app company) owns CZ Pharmacies and the corollary premise that the pharmacies are a "component" of the affiliated CareZone entities -- seems to conflict with plaintiffs' liability case. Dkt. No. 245-5 ¶¶ 29, 31. As the Court discussed in the summary judgment order, the relationship between CZ Pharmacies, comprised of CZ California and CZ Tennessee, and the online app company, CareZone, has become an issue in the case. Dkt. No. 333 at 2-3. Counsel for CZ Pharmacies stated at the hearing: "This is what the dispute is really all about. The pharmacies and CareZone, Inc. are entirely separate entities." Dkt. No. 328 at 34:23-25. The Court noted that both sides agreed that the corporate family tree in Dkt. No. 333 at 3 accurately stated the relationship between these entities, and that a call option allows CareZone to purchase CZ Pharmacies for the nominal sum of $200. Dkt. No. 249-3 at 5 (ESI);

9

Dkt. No. 245-5 at ECF p.79 (CZ Pharmacies). But the parties disagree on the take-aways from this corporate structure. ESI believes that it shows "these CareZone entities work together to mail thousands of prescription drugs to patients across the country." Dkt. No. 249-3 at 4. CZ Pharmacies says it shows there's "no corporate overlap. They are entirely separate entities." Dkt. No. 328 at 34:25-35:1.

As both sides have acknowledged, the nature of the corporate relationship goes to the question of whether CZ Pharmacies operated as a mail order business, or purely as a traditional retail storefront. According to CZ Pharmacies, the "only way you get to any conclusion that the pharmacies did anything that's mailing is by . . . conflating those two [CareZone and CZ Pharmacies] corporate structures together." *Id.* at 35:11-14.

Whether CZ Pharmacies operated as a mail order business is potentially crucial to the parties' claims and defenses. CZ Pharmacies' case is premised in large part on the proposition that it was not a mail order operation, and that ESI improperly terminated its contract after painting it as one. *See, e.g.,* Dkt. No. 24 ¶¶ 58, 90-92 (allegations in complaint). It is undisputed CZ Pharmacies' provider agreements with ESI specifically excluded "mail order . . . provider types." Dkt. No. 249-19 §§ 1.4, 1.8 (CZ California); Dkt. No. 249-20 §§ 1.4, 1.8 (CZ Tennessee). CZ Pharmacies has argued from the beginning of this case that this provision was not violated because CareZone is "a separate company that acts as an agent for patients," to whom the pharmacies dispense medications. Dkt. No. 24 ¶ 20; *see also* Dkt. No. 273-4 at 2 (opposition to summary judgment).

Ms. Snow's damages opinions appear to be at odds with these representations, which are essential to CZ Pharmacies' claims. She describes CareZone's $200 option to purchase the pharmacies as constituting "a derivative ownership structure." Dkt. No. 245-5 ¶ 29. This directly contradicts arguments that CZ Pharmacies made throughout its liability case. *See, e.g.*, Dkt. No. 273-4 at 15 (denying actual malice standard applies for defamation because "the evidence ESI cites does not show the Pharmacies -- separate legal entities with separate ownership from CareZone Inc. -- did anything" (emphasis in original)).

Ms. Snow's identification of CareZone with CZ Pharmacies is a fundamental part of her damages opinions. Under her income approach, for example, she calculates the value of a business based on the value of the cash flows the business can be expected to generate in the future. Dkt. No. 245-5 ¶ 64. The discounted cash flow analysis for Ms. Snow's income approach valuation assumed that CZ Pharmacies made up 95.71% of revenues for the entire CareZone group. Dkt. No. 245-5 at ECF p.74; *see also* Dkt. No. 265-7 ¶ 23 (assumptions used for discounted cash flow analysis provide basis for lost profits approach). Similarly, when Ms. Snow undertook market-based valuation approaches, she again began with the value of the entire group of CareZone-affiliated entities. She stated that "CareZone Pharmacy represents approximately 95% of CareZone revenues from 2015 to 2017. For this reason, I have applied a 95% pro rata adjustment to CareZone valuations to arrive at the valuation of CareZone Pharmacy." Dkt. No. 245-5 ¶¶ 103, 106; *id.* at ECF p.73.

CZ Pharmacies' effort to explain away this apparent contradiction is not reassuring. It says that "the Pharmacies' financial statements are maintained on a consolidated basis with a number of CareZone-affiliated entities, but are easily segregated out." Dkt. No. 265-4 at 11; *see also* Dkt. No. 328 at 59:9-10 ("she has isolated the value of pharmacies by itself"). That may be true, but Ms. Snow repeatedly stated that she applied an across-the-board 95% adjustment to "CareZone valuations to arrive at the valuation of CareZone Pharmacy." Dkt. No. 245-5 ¶¶ 103, 106; *id.* at ECF p.73.

In addition, Ms. Snow removed from her income approach valuation "certain line items, including . . . .marketing and advertising expense," that she decided should be borne in whole or part by CareZone. Dkt. No. 245-5 ¶ 81; *id.* at ECF pp.79-84 (no marketing costs in income approach analysis). The suggestion that CareZone bears the burden of certain line items for CZ Pharmacies again seems incompatible with the notion that they are separate entities. It also leads to the rather expedient conclusion that CZ Pharmacies gets a percentage of all of CareZone's revenues without bearing the cost of generating those revenues.

When the Court raised these and similar issues at oral argument, counsel for CZ Pharmacies said Ms. Snow "looked at the entire enterprise and then worked down to the

11

pharmacies." Dkt. No. 328 at 57:23-24. Counsel for CZ Pharmacies also said that because CareZone has an option on the pharmacies, "if pharmacies' revenues go up, CareZone value goes up." *Id.* at 62:11-12. Ms. Snow drew a much more direct connection, and stated that "CareZone Pharmacy is the largest component, on a revenue basis, of the affiliated CareZone entities representing 95.6% of all revenues across all entities." Dkt. No. 245-5 ¶ 31. Ms. Snow said in effect that when CZ Pharmacies' revenue goes up, CareZone's revenues go up because the pharmacies are a part of CareZone. Dkt. No. 245-5 ¶ 103. In her supplemental report, Ms. Snow vigorously defended herself against ESI's effort "to undermine my conclusion that CareZone Pharmacy is 95% of CareZone Inc." Dkt. No. 265-7 ¶ 18.

Consequently, the Court has substantial doubt that Ms. Snow's opinions fit CZ Pharmacies' essential allegations against ESI. Ms. Snow should be prepared to address these relevance concerns at the hearing.

ESI has raised concerns about some specifics in Ms. Snow's methodology that will also need to be explored at the hearing. These concerns include the fact that the largest input in Ms. Snow's but-for valuation of the pharmacies was the purchase of a single mail order pharmacy, PillPack, by Amazon for $721 million. In her supplemental report, Ms. Snow concedes that while "it may be ideal to have 'five to eight' transactions, the fact of the matter is that sometimes there doesn't exist many transactions in the marketplace and what a valuation expert is more concerned with is the quality of the transactions, not the quantity." Dkt. No. 265-7 ¶ 64. Quality certainly counts, but it is questionable that a reasonable expert would rely on just one transaction for a valuation determination of hundreds of millions of dollars. Ms. Snow did not give a good reason for doing that. In addition, Ms. Snow appears to have selected PillPack and given it great weight based entirely on one online article and the testimony of a CZ Pharmacies witness. Dkt. No. 245-5 ¶ 100; Dkt. No. 265-7 ¶ 31. A reasonable expert would not have relied on data that thin and biased. *See Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 953 (9th Cir. 2011) (affirming exclusion of expert declaration based on "little more than a quick internet search . . . and a few telephone calls"); *see also Crowley v. Epicept Corp.*, 883 F.3d 739, 745 (9th Cir. 2018) (discussing district court opinion that excluded expert testimony for "parroting" plaintiff).

12

Ms. Snow's inferred valuation approach is also questionable. There is no evidence that it has been generally accepted or used by experts in the field, which cuts against admissibility. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999). And it appears to be based almost entirely on CareZone marketing materials -- a Series D venture capital pitch deck. Dkt. No. 245-5 ¶¶ 105-106; Dkt. No. 265-7 ¶ 58 ("Then after review of investor presentations and discussions with CareZone, I determined the expected capital raise in the Series D round"). In response to ESI's challenges, Ms. Snow said that, while it "may not be a traditional market approach, it does rely on transaction information from companies in a comparable investor round, and prior transactions of CareZone in their previous equity rounds, therefore relying on market data to calculate a value." Dkt. No. 265-7 ¶ 60. That a method uses market data is not enough to make it reliable. "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Ms. Snow agreed at her deposition that she had not cited any materials that support the inferred valuation approach as being an approach that experts in the field of business valuation use. Dkt. No. 245-15 at ECF p.32. It also appears Ms. Snow developed the inferred valuation approach for this litigation. *See* Dkt. No. 265-7 ¶¶ 26, 56. That is a "very significant fact" that cuts against a finding that the method "comports with the dictates of good science." *Murray*, 870 F.3d at 923 (quoting *Daubert II*, 43 F.3d at 1317).

For the "Damodaran multiples" of price/sales and EV/Sales, and public comps, Ms. Snow provided virtually no explanation of how she determined these values. There was no apparent method here, which points to exclusion. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). Ms. Snow merely posited that she had completed a "fulsome valuation analysis" for public comps without explaining what that might have been. Dkt. No. 245-5 ¶ 92. So too for the relative valuation multiples calculation. She presented her conclusion that "CareZone was not a 'pure play' and is instead a hybrid model across industries." *Id.* ¶ 104. Why or how this was so was left unsaid.

Ms. Snow's discussion of her combination of these valuation measures was as opaque as its components. In the supplemental report, she gave a valuation range of $670 million to $769 million for the CZ Pharmacies, which informed her conclusion that ESI's termination caused damages of $436 million to $535 million. Dkt. No. 265-7 ¶ 72. She obtained these values by weighting the past transaction (PillPack) at 45%, the inferred valuation at 20%, the income approach at 20%, Damodaran multiplies (price/sales) at 5%, Damodaran multiples (EV/sales) at 5%, and public comps at 5%. Dkt. No. 265-7 at ECF p.34. Why any of these methods are assigned these weights is not explained in the original report. At her deposition, Ms. Snow stated, "Any valuation expert knows that weighting decisions are an exercise in professional judgment, and that's what I've done here. I didn't think that it needed further explanation in the report." Dkt. No. 245-15 at ECF p.46; *see also* Dkt. No. 265-7 ¶ 30. That is dangerously close to an expert magically drawing opinions out of a black box. "Rather than spelling out the steps she took to go from the data to . . . [damages estimate, Ms. Snow] cites her 'experience' -- an abstraction not visible to the eyes of the Court, the jury, and opposing counsel, or testable in the crucible of cross-examination." *Open Text S.A. v. Box, Inc.*, Case No. 13-cv-04910-JD, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) (citing *General Elec. Co.*, 522 U.S. at 146).

Ms. Snow's lost profits method is problematic, too. The initial report says only that where "I have made assumptions, I have chosen the most conservative or most consistent input." Dkt. No. 245-5 ¶ 109. The supplemental report made this utter lack of explanation even worse by declaring that further detail "would have simply been redundant." Dkt. No. 265-7 ¶ 51. This is indicative of a witness hiding the ball. *See Samuels*, 656 F.3d at 953.

The remainder of ESI's objections to Ms. Snow's opinions go to their weight and not admissibility. For example, ESI says she ignored in the income approach analysis a number of events that caused CZ Pharmacies' loss of income, including other PBMs terminating the pharmacies or reducing their price schedule. Dkt. No. 245-4 at 1-2. ESI also says that it cannot be liable for all the damages calculated by Ms. Snow because it invited CZ Pharmacies to apply to be a mail order pharmacy for Medicare Part D, and Medicare and Medicaid make up 65% of the pharmacies' revenue. *Id.* at 2-3. These challenges take issue with the inputs Ms. Snow used, and

14

not the model itself, and so go to the weight rather than admissibility of her testimony. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 968-70 (9th Cir. 2013). "The focus of the district court's analysis must be solely on principles and methodology, not on the conclusions that they generate, and the court's task is to analyze not what the experts say, but what basis they have for saying it." *Grodzitsky v. Am. Honda Motor Co., Inc.*, 957 F.3d 979, 984-85 (9th Cir. 2020) (internal quotation and citation omitted).

The Court would like to hear directly from Ms. Snow on the relevance and reliability issues detailed above. The parties are directed to propose by August 24, 2020, a few dates after September 14, 2020, for a hearing. As the sponsoring party carrying the burden of admissibility, CZ Pharmacies will put on a direct examination of Ms. Snow on these topics, followed by cross-examination by ESI. The examinations and testimony are to be sharply focused on the concerns raised here. Ms. Snow's testimony is strictly limited to the work she has already done, and the opinions she has expressed. The hearing will not be an opportunity for CZ Pharmacies to amend, supplement, revise, or edit Ms. Snow's work under the guise of addressing the Court's concerns. CZ Pharmacies' counsel should be prepared to identify the exact sources of Ms. Snow's testimony at the hearing, either in her reports or deposition testimony. No new declarations or reports of any sort may be filed by either side.

### C. Motion to Strike (Dkt. No. 303)

ESI's motion, Dkt. No. 303, to strike declarations by Ms. Snow and Jonathan Schwartz attached to CZ Pharmacies' opposition to the *Daubert* motion is granted in part and denied in part. The Court found the motion to be suitable for decision on the papers pursuant to Civil Local Rule 7-1(b). Dkt. No. 333 at 1.

Ms. Snow's supplemental expert report is authorized by the expert's duty to supplement. Fed. R. Civ. P. 26(a)(2)(E). The request to strike it is denied.

The declaration of counterclaim-defendant Schwartz was produced nearly three months after the close of fact discovery, and was not authorized or required like Ms. Snow's. CZ Pharmacies' suggestion that the declaration was proper because ESI did not depose him on certain topics is a non-sequitur. "It is one of the most basic propositions of law that the plaintiff bears the

15

1  burden of proving his case, including the amount of damages." *Tourgeman v. Nelson & Kennard*,
2  900 F.3d 1105, 1109 (9th Cir. 2018) (alteration, internal quotation, and citation omitted). As the
3  Court emphasized at the November 8, 2019 discovery hearing, nearly a month before the
4  declaration was filed, "if it wasn't produced, it will not come into evidence." Dkt. No. 237
5  at 45:18-19. Schwartz's late declaration is stricken. CZ Pharmacies' opposition to the motion to
6  strike indicates that Schwartz's declaration adds no new factual information, so the effect of
7  striking the declaration is minimal. Dkt. No. 312-4 at 12-13.

### IV. ESI'S DEVELOPMENTS LETTER (DKT. NO. 332)

On July 20, 2020, ESI filed a letter requesting a status conference to discuss reports of the purchase of CareZone assets for $200 million, and additional discovery with respect to that. The parties are directed to meet and confer on the scope of the discovery, and propose a joint plan for the Court to consider. The plan should be filed by August 24, 2020.

### CONCLUSION

CZ Pharmacies' motions to exclude the expert testimony of Dr. Wooten and Mr. Kvancz are granted in part and denied in part. ESI's motion to exclude the expert testimony of Dr. Hillblom and Mr. Mazzoni is granted in part and denied in part. The motion to strike Ms. Snow's supplemental expert report is denied. Schwartz's untimely declaration is stricken. The parties will propose dates after September 14, 2020, for Ms. Snow's *Daubert* hearing, as described in this order, by August 24, 2020. The parties will file a joint proposed discovery plan relating to the reports of the sale of CareZone assets, also by August 24, 2020.

**IT IS SO ORDERED.**

Dated: August 5, 2020

JAMES DONATO
United States District Judge